**OFFICE OF UTILITY CONSUMER COUNSELOR, Appellant,**

v.

**PUBLIC SERVICE COMPANY OF INDIANA, INC., Appellee.**

No. 93A02–8805–EX–194.

Court of Appeals of Indiana,
Third District.

May 26, 1992.

James L. Turner, Robert K. Johnson, Office of the Utility Consumer Counselor, Indianapolis, for appellant.

Greg K. Kimberlin, Kay E. Pashos, Public Service Co. of Indiana, Inc., Plainfield, for appellee.

STATON, Judge.

The Office of the Utility Consumer Counselor (UCC) appeals from an order of the Indiana Utility Regulatory Commission (Commission) dismissing the UCC's petition to set a hearing on a proposal by Public Service Company of Indiana, Inc. (PSI) to create a holding company through the transfer of all outstanding shares of PSI common stock. The UCC contends that Indiana law requires a hearing and Commission approval of such a transfer, while the Commission and PSI take the position that the statute relied upon by the UCC is inapplicable to the formation of a public utility holding company.

We reverse.

In November of 1987, PSI filed an application with the Federal Energy Regulatory Commission (FERC) pursuant to 16 U.S.C. § 824(b) for approval of PSI's plan to form a holding company. After the Indiana Commission received a copy of this application, the UCC filed a motion to set a hearing on PSI's proposal, contending that IND.CODE 8-1-2-83 requires the Commission to approve such a transaction after a hearing. PSI filed a motion to dismiss the UCC's petition. On May 4, 1988, the Commission granted PSI's motion to dismiss, concluding that the statute was ambiguous as to whether it applied to the proposed formation of a public utility holding company. The Commission also determined that transactions of this nature warranted an investigation in anticipation of rulemaking procedures. It is from this order that the UCC appeals.

Before addressing the merits of the appeal, we first turn to PSI's contentions in support of its renewed motion to dismiss the appeal for want of a justiciable factual or legal controversy. The Court of Appeals for the First District addressed this issue in dismissing a similar appeal as "not ripe for judicial review." In *Office of Utility Consumer Counselor v. Northern Indiana Public Service Co.* (1989), Ind. App., 538 N.E.2d 957, *trans. denied* [hereinafter, *NIPSCO*], the court held that the legality of a public utility's formation of a holding company must be challenged in a declaratory judgment proceeding, rather than in a motion for a hearing before the Commission. Our application of the ripeness doctrine, however, compels a different result.

The federal ripeness doctrine is an element of Article III case and controversy requirements, the basic rationale of the doctrine being:

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681.

The question raised by the UCC in this case, *i.e.*, whether the Commission has the statutorily mandated authority to approve PSI's proposed formation of a holding company, is a purely legal one. Indeed, in the cases cited in *NIPSCO, supra,* our court addressed similar questions when it reviewed several statutes in order to determine whether the Commission had subject matter jurisdiction. *See Kentucky–Indiana Municipal Power Ass'n v. Public Service Co. of Indiana, Inc.* (1979), 181 Ind.App. 639, 393 N.E.2d 776; *U.S. Steel Corp. v. Northern Indiana Public Service Co., Inc.* (1985), Ind.App., 482 N.E.2d 501, *reh'g denied* 486 N.E.2d 1082, *trans. denied.*[1]

---

**1.** The appellant in *Kentucky–Indiana* sought declaratory relief asking the Commission to interpret the respective parties' rights under an agreement formed pursuant to the Interlocal Cooperation Act for the development of a power supply program for towns in Indiana and Kentucky. The appellant conditioned its request for declaratory relief on the Commission's authority over the proceedings; jurisdiction found wanting by this court. *Id.,* 181 Ind.App. at 644–48,

■ A controversy is considered "ripe" when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made. *Sherwyn & Handel v. California State Dep't of Social Services* (1985), 173 Cal.App.3d 52, 218 Cal.Rptr. 778; *California Water & Telephone Co. v. County of Los Angeles* (1967), 253 Cal.App.2d 16, 61 Cal.Rptr. 618. An issue is ripe for review when further administrative processes will not aid in the development of the facts needed by the court to decide the question it is asked to consider. *New York State Ophthalmological Soc. v. Bowen* (D.C.Cir.1988), 854 F.2d 1379, *cert. denied* (1989), 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1003. *See also Rocky Mountain Oil & Gas Ass'n v. Watt* (10th Cir.1982), 696 F.2d 734 (issue is "ripe" when challenged agency action has direct and immediate impact on the challenging party); *Mayne v. U.S.* (1987), 13 Cl.Ct. 60 (judicial evaluation of agency action is "ripe" if the agency action is final and if legal issues are present); *Kaylor v. Fields* (8th Cir.1981), 661 F.2d 1177 (court must be assured that plaintiff will sustain an immediate injury and that such injury would be redressed by the relief requested).

■ Applying the multifarious interpretations of the ripeness doctrine to the challenged action leads to but one conclusion: the issue raised by the UCC is fit for judicial decision. The question presented is not academic or speculative; we need not ask the theoretical "what would happen if" question. The UCC will receive a hearing on PSI's proposal if we decide the Commission has jurisdiction. No hearing will be forthcoming if we reach the contrary result. Either determination will necessarily have a direct and immediate impact on the UCC, which is statutorily charged with representing the interests of all utility rate-

payers in proceedings involving utilities in Indiana. There is no "threat" that a public utility *could* form a holding company; PSI's proposal went far beyond the contemplative stage in its efforts to create such a company. Lastly, there is no question that the Commission's grant of PSI's motion to dismiss was a final agency action. *Indiana Civil Rights Comm'n v. Indiana Dep't of Aging & Community Services* (1988), Ind.App., 529 N.E.2d 872, *trans. denied.*

Having satisfied the first prong of the *Abbott Laboratories* test, we now look to the harm which may result from judicial abstention. *Abbott, supra,* 387 U.S. at 148–49; 87 S.Ct. at 1515, 18 L.Ed.2d 681. *Int'l Union, UAW v. Facet Enterprises, Inc.* (S.D.Mich.1984), 601 F.Supp. 292. It is apparent from the manner in which the parties capably and vigorously argued the issue of jurisdiction that the adversarial process has been well served. Dismissing this appeal would require the UCC to make an identical argument, presumably in an action for declaratory relief, even though there would be no public utility proposal to form a holding company at issue. The subsequent action would cause the Commission to defend a matter that has been fully argued by PSI. Considerations of fairness to the litigants and judicial economy dictate that we consider the issue before us at this time.

This is not to say that the UCC could only have pursued its chosen course of action instead of seeking declaratory relief; the two are not mutually exclusive. Ind.Trial Rule 57 expressly states that: "The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." The Civil Code Study Commission Comments indicate that: "[Trial Rule 57] will extend the remedy in cases where other remedies also will lie...." *See* 4 W. Har-

393 N.E.2d at 779–82. In this case, however, the UCC petitioned for a hearing under the authority granted by statute to the Commission. The two cases are procedurally dissimilar. In *U.S. Steel* the Indiana Public Service Commission unsuccessfully challenged a determination that it had no jurisdiction to issue declaratory judg-

ments as to a company's rights and status as a public utility. 482 N.E.2d at 506, *on reh.* 486 N.E.2d at 1085–86. The court of appeals, however, did analyze the relevant statutes to determine that the petitioner was not a public utility. *Id.*

vey, Indiana Practice 1 (1991). Because we have determined that this issue is ripe for review, however, we believe that further delay in deciding this question is unnecessary.

We agree with the reasoning of the court in *Sherwyn & Handel,* when it recognized:

the requirement [of ripeness] should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question.

173 Cal.App.3d at 58, 218 Cal.Rptr. at 781–82. For these reasons, PSI's renewed Motion to Dismiss is hereby denied.

■ While it is true the Commission has no authority to issue declaratory judgments, *NIPSCO, supra,* it is authorized to hold hearings to gather facts on matters subject to its authority. The question remains whether IC 8–1–2–83 extends to the Commission the authority to conduct a hearing on the proposed formation of a public utility holding company. We find that it does.

The statute in question reads in pertinent part:

No public utility ... shall sell, assign, transfer, lease, or encumber its franchise, works, or system to any other person, partnership, or corporation, or contract for the operation of any part of its works or system by any other person, partnership, or corporation, without the approval of the commission after hearing.

IC 8–1–2–83(a) (hereinafter "section 83").

The Commission based its order primarily on the following reasons: (1) The UCC did not object to the formation of the holding company in any of its filings with the Commission; (2) the UCC did not allege that the formation of the holding company would be contrary to the public interest; and (3) the UCC did not allege that PSI's rates were unreasonable or that its service was deteriorating. Record, p. 187. However, if it is determined the Commission has jurisdiction by virtue of section 83, the above listed reasons lose all significance,

for the Commission must then schedule a hearing to gather facts on the proposed transfer.

Although the Commission refrained from resolving what it perceived to be an ambiguity in section 83, the parties on appeal agree that the provision is plain and unambiguous. Where the UCC contends the plain meaning of the statute covers the proposed reorganization, however, PSI contends the statute is plainly inapplicable. The only dispute concerns whether the formation of a holding company amounts to a sale, assignment, transfer, lease or encumbrance.

■ It is not the prerogative of this court to vary from the plain meaning of unambiguous terms employed by the legislature. *Burks v. Bolerjack* (1981), Ind., 427 N.E.2d 887, 890. As PSI points out, the common meaning of the term "sale" is "a contract for the transfer of property from one person to another for valuable consideration." *Radebaugh v. Scanlan* (1907), 41 Ind.App. 109, 116, 82 N.E. 544, 547. A "transfer" is defined as follows: "To convey or remove from one place, person, etc., to another; pass or hand over from one to another; specifically, to change over the possession or control of...." Black's Law Dictionary 1342 (5th ed. 1979) (citing *Chappell v. State* (1940), 216 Ind. 666, 25 N.E.2d 999).

PSI describes its proposed reorganization as a transaction whereby PSI shareholders exchange their shares of common stock for shares of common stock in the holding company. By the very definitions supplied by PSI, it is clear that such a corporate reorganization involves a sale, or at the very least, a transfer of the public utility's franchise, works, or system. In fact, PSI considered its corporate reorganization a "transfer" in its application for approval submitted to the FERC. Record, p. 30.

Other considerations support this conclusion. For instance, in *Illinois–Indiana Cable Television Ass'n, Inc. v. Public Service Comm'n of Indiana* (1981), Ind.App., 427 N.E.2d 1100, our First District was asked to determine whether section 83 re-

quired Commission approval over incidental leases of utility property when operation of the utility remained in control of the utility-lessor. In concluding that it did not, the court held:

> We interpret this statutory provision to provide, among other things, assurance that Commission approval is to be gained before a utility may be operated or controlled by any person other than that person who is licensed or permitted to do so.... consequently, the Commission must approve any arrangement whereby the control and operation of a utility service is sought to be transferred to a person other than that person previously authorized.

*Id.* at 1108. This case does not present the situation where an incidental portion of the utility is sold to another entity; PSI's proposal contemplates a transfer of every share of common stock to a holding company, a transaction that could drastically affect rates and capital.

█ PSI contends that IC 8–1–2–49, which pertains explicitly to public utility holding companies, operates to exclude the Commission from overseeing the formation of such entities. While it is true that this provision regulates certain transactions between a public utility and its affiliated interests, there is no language in that section that can reasonably be construed as a limitation on the Commission's jurisdiction to approve the creation of a holding company. Indeed, IC 8–1–2–49 is indicative of the legislature's intent to have an active, reviewing interest in the operation of utilities that have a monopolistic advantage in the state's economic community. Section 83 is just another example of the Commission's authority to protect the public from ill-advised business schemes and efforts to avoid the regulatory system carefully orchestrated by the legislature. *See NIPSCO, supra,* at 960 (Staton, J., dissenting).

These concerns are shared by the federal government in its regulation of public utilities, as evidenced by the following statute:

> No public utility shall sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, ... or by any means whatsoever, directly or indirectly, merge or consolidate such facilities or any part thereof with those of any other person, or purchase, acquire, or take any security of any other public utility, without first having secured an order of the Commission authorizing it to do so.

16 U.S.C. § 824b(a). Although the federal statute, like section 83, does not expressly include the formation of a holding company within its scope, the FERC concluded that the transfer of ownership and control in the utility's jurisdictional facilities from the existing shareholders to the holding company required its approval under the statute. *Re Central Vermont Public Service Corp.,* 84 Pub.Util.Rep. 4th (PUR) 213 (June 15, 1987). The FERC recognized that, although the stockholders of the utility would become the stockholders in the holding company, "they will no longer have a proprietary interest in, or direct control over, the jurisdictional facilities. The substance of the transaction, therefore, is a 'disposition' of facilities via the transfer of all direct control...." *Id.* at 215–16. The FERC went on to cite the potential for abuse adverse to the public interest when a public utility becomes the wholly-owned subsidiary of the parent holding company. *Id.* at 216–17.

The Public Utility Holding Company Act of 1935 establishes the federal policy recognizing this potential for abuse, and states in part:

> [I]t is declared to be the policy of this chapter, in accordance with which policy all the provisions of this chapter shall be interpreted, to meet the problems and eliminate the evils as enumerated in this section, connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce[.]

15 U.S.C. § 79a(c).

The "evils" of public utility holding companies enumerated in the Act include:

(1) when such investors cannot obtain the information necessary to appraise the financial position or earning power of the

issuers, because of the absence of uniform standard accounts; when such securities are issued without the approval or consent of the States having jurisdiction over subsidiary public-utility companies; when such securities are issued upon the basis of fictitious or unsound asset values having no fair relation to the sums invested in or the earning capacity of the properties and upon the basis of paper profits from intercompany transactions, or in anticipation of excessive revenues from subsidiary public-utility companies; when such securities are issued by a subsidiary public-utility company under circumstances which subject such company to the burden of supporting an overcapitalized structure and tend to prevent voluntary rate reductions;

(2) when subsidiary public-utility companies are subjected to excessive charges for services, construction work, equipment, and materials, or enter into transactions in which evils result from an absence of arm's-length bargaining or from restraint of free and independent competition; when service, management, construction, and other contracts involve the allocation of charges among subsidiary public-utility companies in different States so as to present problems of regulation which cannot be dealt with effectively by the States;

(3) when control of subsidiary public-utility companies affects the accounting practices and rate, dividend, and other policies of such companies so as to complicate and obstruct State regulation of such companies, or when control of such companies is exerted through disproportionately small investment;

(4) when the growth and extension of holding companies bears no relation to economy of management and operation or the integration and coordination of related operating properties; or

(5) when in any other respect there is lack of economy of management and operation of public-utility companies or lack of efficiency and adequacy of service rendered by such companies, or lack of effective public regulation, or lack of economies in the raising of capital.

15 U.S.C. § 79a(b). These matters are appropriate areas of concern for ratepayers in this state as well.

We conclude that the plain language of section 83 confers jurisdiction upon the Commission in cases where a public utility proposes the formation of a holding company. Sound policy considerations support Commission control over a transaction so affected with the public interest. Accordingly, the Commission must hold a hearing on PSI's proposal to create its holding company.

Reversed and remanded.

GARRARD, J., concurs.

HOFFMAN, J., dissents and files separate opinion.

HOFFMAN, Judge, dissenting.

I respectfully dissent.

The case of *Office of Util. Cons. Counselor v. NIPSCO* (1989), Ind.App., 538 N.E.2d 957, *trans. denied*, adequately disposed of this case. I would affirm the trial court.